**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RUFUS LOVE**

            **Plaintiff,**             **CIVIL ACTION NO. 05-CV-74028-DT**

    **vs.**                    **DISTRICT JUDGE GEORGE CARAM STEEH**

**COMMISSIONER OF**          **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

            **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**      **RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment be **DENIED** (Docket # 8), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 7), and that the case be **REMANDED** for further proceedings consistent with the Report.

**II.**     **PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Rufus Love filed an application for Disability Insurance Benefits (DIB) in July 2002. (Tr. 41-43). He alleged he had been disabled since July 17, 2001 due to spinal and foraminal stenosis. (Tr. 50-59). Plaintiff's claims were initially denied in January 2003. (Tr. 28-32). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 33). A hearing took place before ALJ John Ransom on July 22, 2004. (Tr. 361-388). Plaintiff was represented at the hearing.

(Tr. 26-27, 361). The ALJ denied Plaintiff's claims in an opinion issued on January 25, 2005. (Tr. 12-23). The Appeals Council denied review of the ALJ's decision on August 22, 2005 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 5-8). Plaintiff appealed the denial of his claims to this Court, and both parties have filed motions for summary judgment.

## III.   **MEDICAL HISTORY**

In March 2001 Plaintiff had a lipoma successfully removed from his left thigh. (Tr. 109). Plaintiff reported to Dr. K. Abdulhak in early April 2001 that he still felt pain and numbness in his left leg. (Tr. 236). An examination showed minimal tenderness with no localized warmth or discoloration and a limited range of motion. Physical therapy and medication were prescribed. *Id.* Plaintiff was initially evaluated for physical therapy on May 1, 2001. (Tr. 213-14). At the time, Plaintiff had limited hip flexion, external hip rotation, and knee flexion on his left side. (Tr. 214).

Plaintiff told Dr. Abdulhak on July 12, 2001 that he could not work anymore due to left side pain. (Tr. 225). Dr. Adulhak found no evidence of any lumps or localized warmth or redness. *Id.* An MRI was subsequently ordered. *Id.*

Dr. Adulhak examined Plaintiff on August 2, 2001 who was complaining of severe left-sided pain in his neck, shoulder, and arm. Plaintiff also reported depression. An examination revealed no muscle tenderness in his left trapezius zone or left arm. Plaintiff's deep tendon reflexes were unaffected and he had a good peripheral pulse. (Tr. 224). Dr. Adulhak prescribed Zoloft for Plaintiff's depression. *Id.*

On August 16, 2001 Plaintiff reported that he still had neck and left shoulder pain but that he felt better than he had at the last visit. He also stated that he was under a lot of stress. (Tr. 220). Dr. Abdulhak increased the dosage of Plaintiff's medication and set up an appointment for Plaintiff

to see a therapist.  *Id.*  Plaintiff was seen by therapist Linda Hale for an intake assessment on August 23, 2001.  (Tr. 192-98).  Ms. Hale diagnosed Plaintiff with major depression and assigned him a Global Assessment of Functioning ("GAF") score of 49.  She noted that Plaintiff was well-groomed and calm.  His affect was flat.  Plaintiff's thought content was normal but his thought process was circumstantial.  He was fully oriented but his short term memory, judgment, and insight were impaired.  (Tr. 193).  Ms. Hale recommended that Plaintiff have a psychiatric evaluation and attend 20 weekly individual therapy sessions.  (Tr. 196-97).

Plaintiff began treatment with Dr. C.A.N. Roa, a psychiatrist, in September 2001 for depression.  (Tr. 187).  In September 2001 Plaintiff was briefly admitted to the hospital for depression where he was examined by Dr. Dong H. Yoo.  Plaintiff discussed his problems regarding his ex-wife, current wife, work, and injuries.  He also stated that he wanted the doctor to place him on long-term disability.   Dr. Yoo noted that Plaintiff's general fund of knowledge and comprehension were good and his judgment and insight were fair.  Dr. Yoo diagnosed Plaintiff with major depression and alcohol abuse and assigned Plaintiff a GAF score of 35.  (Tr. 116-19).

Plaintiff's report of pain continued in December 2001.  (Tr. 142-43).  An MRI was taken of Plaintiff's cervical spine on December 23, 2001, which showed severe spinal stenosis at C3-C4, C4-C5, and C5-C6 with an abnormal signal identified in the spinal cord at C3-C4 compatible with myelomalacia.  There was also evidence of bilateral foraminal stenosis at all levels from C3-C4 through C6-C7, with mild central canal stenosis at C6-C7.  (Tr. 141, 171).  A subsequent electroneuromyographic ("EMG") report showed evidence of sub-acute to chronic and moderately severe left upper extremity cervical paraspinal denervation with radiculopathy in the distribution of C4-C5 and C6 roots.  (Tr. 255-257).

2:05-cv-74028-GCS-MKM   Doc # 11-2   Filed 01/11/07   Pg 4 of 24   Pg ID 500

An examination by Dr. Ghaus M. Malik on January 2, 2002 showed a normal gait, intact heel-toe walking and toe-tapping, and no vibration in Plaintiff's lower extremities. Plaintiff's reflexes were brisk and greater on the left side. His muscle strength was 5/5 throughout. However, it was noted that Plaintiff had weakness of his bilateral intrinsic muscles in his upper extremities, especially on the left side, and he had decreased triceps strength on the left. (Tr. 154).

Dr. Malik also reviewed Plaintiff's recent MRI and concluded that Plaintiff was a good surgical candidate. A posterior cervical decompression and a left-sided forminectomy were scheduled. Dr. Malik also ordered an MRI of Plaintiff's lumbar spine because of Plaintiff's complaints of lower back pain. (Tr. 155). An MRI of Plaintiff's lumbar spine subsequently showed evidence of disc herniation at L5-S1, greater on the left side. (Tr. 152, 156). A straight leg raising test was negative, however, and Plaintiff's reflexes were normal. (Tr. 140). Dr. Malik reviewed Plaintiff's lumbar spine MRI on January 16, 2002. He advised Plaintiff that he did not feel the herniation warranted surgical intervention at that time but would be re-evaluated after the cervical decompression was completed. (Tr. 152-53).

On January 22, 2002 Plaintiff underwent a decompressive laminectomy. (Tr. 121, 123-24, 151). Medical records indicate that Plaintiff had near complete resolution of his neck pain immediately following surgery although Plaintiff complained of some non-disabling left fingertip numbness. (Tr. 122). No focal neurological deficits were found and he was released in stable condition with instructions not to bend, twist, or turn his neck and to wear a cervical collar for comfort. *Id.*

Plaintiff was seen by Dr. Malik in February 2002 complaining of pain after having fallen twice. (Tr. 149). X-rays showed good alignment and no acute processes. (Tr. 149, 305, 243). Dr.

-4-

Pankaj Vakharia noted in mid-February 2002 that Plaintiff continued to complain of pain. However, he noted no weakness in Plaintiff's legs. (Tr. 138).

Dr. Malik reported in March 2002 that Plaintiff continued to improve post-operatively although he complained of grip problems in both hands and tired shoulders. He also noted that Plaintiff's change in medication from Vicodin to Tylenol #3 likely explained Plaintiff's lethargy although Plaintiff noted that it did help control his pain. Because Plaintiff continued to report pain, Dr. Malik ordered another MRI of Plaintiff's cervical spine. (Tr. 147-48). The MRI showed postoperative changes of the cervical spine with evidence of a small area of myelomalacia in the cervical spinal cord at the C3-C4 level and a mild disc spur at the C6-C7 and C7-T1 levels. However, there was no focal disc herniation or spinal stenosis. (Tr. 126).

In April 2002 Dr. Malik reviewed Plaintiff's recent MRI. He opined that the changes seen in the MRI were not significant and did not require surgical intervention. (Tr. 146). Dr. Malik also noted that Plaintiff needed a lot of prescriptions for pain medication and that Plaintiff was not taking his anti-depressants. Dr. Malik recommended rehabilitation work with physical therapy, and prescribed more Tylenol #3. (Tr. 145-46).

Plaintiff informed Dr. Vakharia in May 2002 that his pain medication was not working although physical therapy had helped some. (Tr. 132). Plaintiff's range of motion in his neck was restricted and there was lower back tenderness. Dr. Vakharia consulted with Dr. Malik, who recommended an epidural injection. *Id.*

Dr. Vaharia's progress notes from June 2002 state that Plaintiff had slight left arm weakness, hand weakness, no leg weakness, and positive reflexes overall. (Tr. 129, 131). Dr. Vaharia also noted that Plaintiff was being weaned off of Tylenol #3. (Tr. 131).

-5-

Dr. Malik saw Plaintiff in July 2002 for a follow-up appointment.  He noted Plaintiff's neck pain had improved and he had better neck mobility.  However, Plaintiff still complained of lower back pain.  Dr. Malik commented that surgery on Plaintiff's lower back "might need to be reassessed if we get to the stage of considering any surgical intervention."  (Tr. 144).  Dr. Malik also recommended that Plaintiff take Elavil because he was not getting good pain control and needed help sleeping.  *Id.*

In late July 2002 Plaintiff was seen by Dr. V. Pasupuleti for his lower back pain.  Upon examination, Plaintiff had a slightly limited range of motion in his neck upon flexion, extension, and lateral rotation.  He also had a positive Spurling's phenomenon and straight leg raising test at 40 to 50 degrees on the left side.  However, no atrophy or weakness in the lower extremities was found. Plaintiff had generally depressed reflexes in the upper and lower extremities, decreased sensation in the lateral left thigh, and moderately diminished vibration in the lower extremities but intact position sense.  (Tr. 252-53).  Dr. Pasupuleti explained to Plaintiff that lower lumbar spine surgery was not an emergency and recommended conservative treatment, including wearing a neck and back brace, using a TENS unit, and exercise.  (Tr. 253).  Another EMG was ordered of Plaintiff's upper and lower extremities.  *Id.*

The second EMG of Plaintiff's bilateral upper extremities showed sub-acute to chronic and mild radiculopathy of the left C6-C7 roots.  The EMG of Plaintiff's bilateral lower extremities showed sub-acute to chronic and moderate radiculopathy of the L5-S1 roots.  (Tr. 250-51).

By September 2002 Dr. Rao reported that Plaintiff had a GAF score of 50.  Dr. Roa noted that Plaintiff had no perceptual disturbances, that his thought process was logical and his thought content appropriate, and that he had good insight.  Plaintiff was also fully oriented.  (Tr. 187-89).

-6-

Dr. Malik noted in September 2002 that Plaintiff was "managing things pretty well."  He believed Plaintiff was recovering from his neck surgery.  Although Plaintiff still had residual weakness in his left arm, it had definitely improved.  (Tr. 241).  Plaintiff met with Dr. Pasupuleti who noted that Plaintiff continued to complain of lower back pain despite wearing a brace and using medication.  Dr. Pasupuleti commented that having elective surgery was Plaintiff's choice and that he should discuss this option with Dr. Malik.  (Tr. 246).

A review of Plaintiff's medical records by a state agency medical consultant, Dr. Russell Holmes, in September 2002 indicated that Plaintiff could lift/carry 5 pounds frequently and 10 pounds occasionally, stand/walk for 4 hours in an 8-hour workday, sit for 6 hours out of an 8-hour workday, and had limited ability to frequently use left hand controls.  (Tr. 158).  Dr. Holmes also opined that Plaintiff: (1) should not climb ladders/ropes/scaffolds; (2) could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; (3) could frequently, but not constantly, handle and finger with both hands and feel with his left hand; and (4) should avoid even moderate exposure to vibration and hazards such as machinery and heights.  (Tr. 159-61).

Plaintiff informed Dr. Malik in November 2002 that Dr. Pasupuleti felt that surgery on Plaintiff's lower back might be helpful.  (Tr. 240).  Dr. Malik noted that they would address this issue after the EMG was reviewed.  (Tr. 240).  Plaintiff also dropped out of his mental health treatment program the same month and was discharged.  (Tr. 266).

Dr. Sydney Joseph completed a Psychiatric Review Technique ("PRT") form in November 2003.  Dr. Joseph noted that Plaintiff had "major depression showing progress (2° to pain)."  (Tr. 202).  He opined that Plaintiff's mental impairment was not severe.  (Tr. 199).  Dr. Joseph concluded that Plaintiff had no episodes of decompensation of an extended duration and only mild restriction

of activities of daily living and mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (Tr. 209).

Dr. Pasupuleti saw Plaintiff again in January 2003 for his lower back pain.  Plaintiff had a positive straight leg raising test on the left side at 20 degrees with depressed reflexes and decreased sensation.  He also had a "tough time bending forward and backward."  (Tr. 245).

Plaintiff was also reassessed by therapist Linda Hale to resume mental health treatment in January 2003.  (Tr. 262-65).  It was recommended that Plaintiff continue individual counseling.  (Tr. 262).  The last notes of Dr. Roa in 2003 indicate that Plaintiff was to continue on his medication.  (Tr. 259, 261).

Plaintiff also had two epidurals in March 2003.  (Tr. 244, 297).  Plaintiff continued to complain of neck and lower back pain.  Plaintiff had increased strength in his hands and a negative slow leg raising test.   (Tr. 297).

Plaintiff returned to Dr. Pasupuleti in April 2003.  Dr. Pasupuleti noted that all of Plaintiff's medication except for Tylenol #3 had been discontinued because of Plaintiff's anti-smoking medication.  Plaintiff reported that he had thought about having surgery for his lower back but had gotten different opinions from his wife and mother.  Dr. Pasupuleti told Plaintiff that the decision to have surgery was up to him.  Dr. Pasupuleti told Plaintiff that the surgery was not an emergency in that he would not become paralyzed if surgery was not performed but had more to do with Plaintiff's reported pain.  (Tr. 244).  In late April 2003 Plaintiff was again discharged from his mental health treatment program because he reportedly "moved out of state."  (Tr. 260).

In June 2003 Plaintiff informed Dr. Vakharia that the epidurals were of no help although the TENS unit helped some.  (Tr. 290).  Dr. Vakharia recommended physical therapy.  Plaintiff had

tendinitis of his upper left arm, mild weakness in his left and right hands, and a low backache.  (Tr. 291, 294).  Plaintiff tried physical therapy for two days but reported that it did not work.  Plaintiff was subsequently discharged.  (Tr. 289, 290).

In March 2004 Dr. Vakharia noted mild weakness and numbness in Plaintiff's left hand.  By August 2004, he noted weakness in Plaintiff's left shoulder abductors with left upper arm and neck tenderness with muscle spasms and tenderness in Plaintiff's left lower back.  (Tr. 278-79).  Dr. Vakharia filled out a form entitled "Medical Assessment of Physical Capacity to Work" on August 27, 2004.  He opined that Plaintiff could lift between 0 and 5 pounds, sit for 4 hours out of an 8 hour workday, stand for 1 hour out of an 8 hour workday, could never climb, balance, stoop, crouch, kneel, bend, crawl, push/pull, reach, or handle, and could occasionally feel.  (Tr. 274).  Dr. Vakharia also concluded that Plaintiff needed to rest frequently for 4 times per day for 30 minutes each time.  He cited to Plaintiff's spinal stenosis and herniated cervical and lumbar discs as objective support for his findings.  (Tr. 275).

## IV.  **HEARING TESTIMONY**

### A.  **PLAINTIFF'S TESTIMONY**

Plaintiff was 43 years old when he testified before the ALJ and he had a 9th grade education.  (Tr. 364, 366).  Plaintiff told the ALJ that he was injured on the job when he fell and hurt his leg.  (Tr. 368).  As a result, he received $500 every 15 days from Worker's Compensation.  *Id.*  He also testified that at the same time he began to experience depression as a result of his injury, problems dealing with his wife, ex-wife, and child support obligations.  (Tr. 369).  Plaintiff explained that he had told his doctor about pain and numbness in his legs and in his left arm as a result of his injury and that his doctor thought the problem was psychological.  *Id.*  Therefore, his doctor sent him to

a therapist who then referred him to a psychiatrist for evaluation. The psychiatrist told Plaintiff that there was nothing wrong with him mentally and referred Plaintiff to a different medical doctor. Follow-up examinations showed problems with his spine. (Tr. 369-70). Plaintiff stated that in September 2001 he was admitted into the Hurley Medical Center overnight for depression. (Tr. 370). He was drinking heavily during this time period but his therapist helped him understand that he needed to stop drinking to let his medication work. Things got better once he stopped drinking in the beginning of 2002. (Tr. 371-73).

Plaintiff claimed that he did not experience improvement after his 2002 back surgery because he continued to have tired shoulders and a throbbing left arm. (Tr. 374). Plaintiff took a low dosage of Valium to help with his left arm pain and wore a low-dosage medicine patch for his back pain. *Id.* He also wore a back brace with a heat patch when traveling. Plaintiff's medication often made it difficult for him to remember things. (Tr. 376-77, 384-85). Plaintiff further testified that he could not hold onto anything with his left hand because of CTS.

When asked about his activities, Plaintiff stated that he cooked for himself but used smaller pots because he could not hold the larger ones. (Tr. 375). He washed clothes although his godmother sometimes helped him. (Tr. 379). He also attended church on Sundays from 11 until 1:30 where he helped as a "Special Deputy." This position allowed him to sit, or get up and walk around the church as needed. (Tr. 360, 381-82). Plaintiff testified that when the weather was cold or cloudy it made him ache more. (Tr. 380). He took naps every day around 9:00 a.m. for a ½ hour to 1 hour before waking up to eat and watch television or a movie. Then he would take his medication, become drowsy, and fall asleep again. When he woke up, he would do something

-10-

outside such as go to the post office.  After coming back, Plaintiff watched television or read a book.  (Tr. 380-81).  Plaintiff estimated that he slept two to three times a day.  (Tr. 381).

Plaintiff testified that he could stand 30 minutes to an hour before crouching down if on his medication.  (Tr. 382-83).  He thought he could walk for 20 yards before needing to sit down.  (Tr. 383).  He could not lift with his left hand although his right side was very strong.  (Tr. 384).  Plaintiff further stated that he could "do very well" at sitting if on his medication.  *Id.*

### B.   VOCATIONAL EXPERT'S TESTIMONY

Ms. Pauline McEachin, a certified rehabilitation counselor, testified as a vocational expert at the hearing.  (Tr. 56, 386-88).  The ALJ asked Ms. McEachin about the type and number of jobs available in the regional economy for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of performing sedentary work with a sit/stand option and with the following requirements:  (1) no repetitive bending, twisting, or turning; (2) no repetitive pushing, pulling, gripping, or grasping with his left upper extremity; (3) no prolonged or repetitive rotation, flexion, or extension of his neck; and (3) no working around unprotected heights or moving machinery due to his medications.  (Tr. 387).

Ms. McEachin testified that the hypothetical individual described by the ALJ could perform a number of jobs of unskilled, sedentary jobs including 2,000 video surveillance monitor positions, 1,200 information clerk positions, 1,100 ID clerk positions, 2,200 visual inspector positions, and 5,000 inspector positions.  *Id.*  Ms. McEachin also testified that all work would be precluded if the ALJ credited Plaintiff's testimony that he needed to lie down 2 to 3 times a day for about ½ hour to 1 hour at unpredictable times.  (Tr. 386).

## V.   LAW AND ANALYSIS

A.     **STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to   try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

B.     **FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff had to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

      (4)     he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391.

### C.    <u>ANALYSIS</u>

Plaintiff alleges that substantial evidence does not support the ALJ's finding that he retained the RFC to perform a limited range of sedentary work.  Specifically, Plaintiff contends that the ALJ erred by: (1) finding that he does not suffer from a severe mental impairment; (2) rejecting the opinion of his treating physician, Dr. Vakharia; and (3) finding Plaintiff's testimony regarding his disabling pain to be less than fully credible.

### 1.    <u>Finding Regarding Plaintiff's Mental Impairment</u>

Plaintiff claims that the ALJ erred by finding that he did not suffer from a severe mental impairment.  The Act defines a non-severe impairment as an impairment or combination of impairments that "does not significantly limit . . . physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The Commissioner has prescribed rules for evaluating the severity of mental impairments.  *See* 20 C.F.R. § 404.1520a.  The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories.  *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A.  The clinical findings are

referred to as the "A" criteria.  The ALJ determined that the "A" criteria were met in this case in that between late 2001 through 2002 Plaintiff suffered from major depression.  (Tr. 19).

However, the diagnosis of a mental impairment does not alone establish disability under the social security regulations.  Rather, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area.  Thus, the Commissioner must evaluate deficits in activities of daily living and social functioning and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme.  Limitations in a third area of concentration, persistence, or pace are rated on the same five-point scale. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  20 C.F.R. § 404.1520a(c).  The regulations state that if "we rate the degree of your limitations in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) are not severe. . . ."  20 C.F.R. § 404.1520a(d)(1).

The ALJ applied the "B" criteria and determined that Plaintiff's major depression resulted in only mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace, and no episodes of decompensation for extended periods of duration.  (Tr. 19).  Consequently, the ALJ determined that Plaintiff did not have a severe mental impairment.  *Id.*

-14-

The ALJ's finding is substantially supported by the opinion of Dr. Joseph who made the same conclusions as those reached by the ALJ. (Tr. 202-09). Significantly, the record contains no findings from Plaintiff's treating mental health doctors that Plaintiff's major depression resulted in particular work-related limitations.[1]

Nevertheless, Plaintiff asserts that the ALJ's finding is erroneous because Plaintiff was assigned GAF scores of 35, 49, and 50, and because Plaintiff was prescribed anti-depressant medication. Plaintiff points to no case law that suggests the mere prescription of anti-depressant medication renders one's mental impairment severe. He also points to no evidence in the record indicating that he informed any of his doctor's that his anti-depressant medication caused any adverse symptoms affecting his activities of daily living, or his ability to maintain social functioning or to maintain concentration, persistence, or pace. Although Plaintiff reported some short-term concentration problems to Ms. Hale in September 2001 he did not state that it was due to his medication. Furthermore, there is no indication that these concentration problems were more than mild, as found by the ALJ. Additionally, there was a statement by Dr. Malik in April 2002 that Plaintiff was not even taking his prescribed anti-depressants.

_____

[1]   Plaintiff's therapist, Linda Hale, and his psychiatrist, Dr. Rao, submitted various reports indicating that Plaintiff was totally disabled due to his major depression. Linda Hale was not an "acceptable" medical source as she was not a psychologist or psychiatrist. 20 C.F.R. § 404.1513(a). Furthermore, neither Ms. Hale nor Dr. Rao included any objective medical support for their opinions. Therefore, those opinions were not entitled to any particular deference. 20 C.F.R. § 404.1527(d)(2). Furthermore, the ALJ need not "give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." 20 C.F.R. § 404.1527(e)(3). One such issue is "the determination or decision about whether you meet the statutory definition of disability." 20 C.F.R. § 404.1527(e)(1). Therefore, the ALJ was not required to defer to their opinion that Plaintiff was totally disabled.

-15-

Plaintiff also asserts that his low GAF scores were indicative of an individual with a severe mental impairment and that the ALJ erred by not specifically discussing them.  The GAF scale is used by clinicians to report an individual's overall level of functioning.  *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 32 (Text Rev. 4th ed. 2000) ("DSM-IV").  A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication ∧∧∧OR major impairment in several areas, such as work ∧∧, family relations, [or] judgment," while a GAF of 41-50 indicates "[s]erious symptoms ∧∧∧OR any serious impairment in social or occupational ∧∧∧functioning."  *Id.*, at 34.  Thus, a GAF scores may indicate problems that do not necessarily relate to the ability to hold a job.  *See id.*

Consequently, the GAF score alone is not evidence of an impairment seriously interfering with claimant's ability to work.  The GAF "score is a subjective determination that represents 'the clinician's judgment of the individual's overall level of functioning.' "  *Wesley v. Comm'r of Soc. Sec.*, 2000 WL 191664 *3 (6th Cir. 2000).  The Sixth Circuit previously held that the failure to reference a GAF score is not sufficient ground to reverse a disability determination.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (While a GAF score may be of "considerable help," it is not "essential" to determining an individual's residual functional capacity.); *see also Kornecky v. Comm'r of Soc. Sec.*, 2006 WL 305648 **13-14 (6th Cir. 2006) ("[A]ccording to the [DSM-IV] explanation of the [GAF] scale, a score may have little or no bearing on the subject's social and occupational functioning.... [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [GAF] score in the

first place."). [2]  In sum, Claimant's GAF scores does not undermine or provide significantly
probative evidence in opposition to the ALJ's ultimate conclusions concerning the seriousness of
claimant's mental status or ability to work because Ms. Hale, Dr. Yoo, and Dr. Rao did not
provide any opinion that Plaintiff's depression resulted in  particular work-related limitations.

Other substantial evidence provides support for the ALJ's determination.  Plaintiff
testified that the doctor who treated him in 2001 told him that nothing was mentally wrong with
him and that Plaintiff's depression improved with therapy, the resolution of his divorce, and his
decision to stop drinking alcohol.  As also noted by the ALJ, Ms. Hale's report, approved by Dr.
Rao, stated that Plaintiff's condition was improving by May 2002 and it was expected that
Plaintiff's treatment goals would be achieved by August 2002.  (Tr. 197). [3]  Given the evidence

---

[2]      The Commissioner also has declined to endorse the GAF score for use in the
Social Security disability programs, indicating that the scores have no "'direct correlation to the
severity requirements of the mental disorders listings. " 65 Fed. Reg. 50746, 50764-65 (Aug. 21,
2000).

[3]      The ALJ further commented that Plaintiff dropped out of treatment in November
2002 and sought no further mental health treatment.  The record indicates that Plaintiff was
actually re-assessed for mental health treatment at the Oakland Psychological Clinic in 2003
although there was no evidence that Plaintiff received any further actual treatment. Plaintiff also
saw Dr. Rao in March and May 2003 to review his prescription but this evidence provides no
probative insight into whether the severity of Plaintiff's impairment.  Plaintiff asserts that the
ALJ erroneously relied upon evidence of his lack of mental health treatment because he testified
that he had lost his insurance in late 2002 so he could not pay for more treatment, which was
testimony recognized by the ALJ.  The evidence that Plaintiff was re-assessed at the Clinic in
January 2003 and saw Dr. Rao in May 2003 cuts against Plaintiff's claims as does the evidence
that Plaintiff had continuing treatment in 2003 and 2004 for his physical impairments.
Furthermore, the discharge summaries do not indicate that Plaintiff dropped out of treatment for
financial difficulties.  In fact, his 2003 discharge states that Plaintiff "moved out of state."
However, as the ALJ made no findings as to this issue, it was not considered by the Court as a
factor substantiating the ALJ's finding.  *See* SSR 96-7p, 1996 WL 374186 * 7 (ALJ must
consider claimant's explanations for failure to seek medical treatment).

-17-

as a whole, the ALJ's step two determination that Plaintiff did not suffer from a severe mental impairment.

Plaintiff further contends that the ALJ erred by not ordering a consultative medical examination to further explore Plaintiff's claims of major depression, and thus did not make the required "full inquiry" into Plaintiff's condition as required under 20 C.F.R. § 404.1444. The burden of providing a complete record for the ALJ to review rests with the claimant. *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). The ALJ had before him the reports of Dr. Roa and Dr. Yoo as well as Plaintiff's testimony that his doctor told him that nothing was wrong with him mentally and Plaintiff's reports of daily activity, which indicated that his difficulties were associated with his physical, rather than mental, impairments. Plaintiff also did not claim depression as a basis for his disability in his DIB application. (Tr. 50-59). The ALJ therefore had a record "complete and detailed enough" to determine the severity of Plaintiff's major depression. It was not incomplete merely because it did not provide the evidence Plaintiff now seeks.[4] Therefore, the ALJ did not abuse his discretion by not ordering a consultative examination.

### 2.    The ALJ's RFC Finding

The ALJ found that Plaintiff had the RFC to perform a limited range of unskilled, sedentary work with: (1) a sit/stand option; (2) no repetitive bending, twisting, or turning; (3) no

---

[4]    "[F]ull inquiry" does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make a disability decision. *Landsaw,* 803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671  (5th Cir. 1977)) (emphasis in original omitted).

repetitive pushing, pulling, gripping or grasping with the left upper extremity; (4) no unprotected heights or working around dangerous machinery; and (5) no prolonged or repetitive rotation, flexion, or extension of the neck.  (Tr. 20).

### a.    Plaintiff's Treating Physician

Dr. Vakharia submitted several disability forms indicating that Plaintiff was totally disabled.  In August 2004 Dr. Vakharia also opined that Plaintiff could only lift between 0 and 5 pounds, sit for 4 hours out of an 8-hour workday, stand for 1 hour out of an 8-hour workday, could never climb, balance, stoop, crouch, kneel, bend, crawl, push/pull, reach, or handle, and could occasionally feel.  (Tr. 274).  Dr. Vakharia also concluded that Plaintiff needed to rest frequently for 4 times per day for 30 minutes each time.  He cited to Plaintiff's spinal stenosis and herniated cervical and lumbar discs as objective support for his findings.[5]  (Tr. 275). Plaintiff invokes the treating physicians doctrine and asserts that the ALJ's RFC finding and non-disability determination is fatally flawed because they are inconsistent with Dr. Vakharia's opinions.

The Commissioner of Social Security generally gives "more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2). The Commissioner will give the opinion of a treating physician controlling weight if the opinion is well-supported and not inconsistent with the other substantial

---

[5]    In an ancillary disability report dated 8/25/03 Dr. Vakharia also opined that Plaintiff was unable to engage in any substantially gainful activity and that his back impairments were quite severe, citing to a bilateral straight leg raising test at 40 degrees and decreased sensation in Plaintiff's left thigh.  (Tr. 287-88).

evidence. *Id.* When the opinion of the treating physician is not given controlling weight, factors such as the length of the treatment relationship, nature and extent of the treatment relationship, and the supportability of the physician's opinion will be considered in determining how much weight to afford the opinion. *Id.* The regulations also require the ALJ to give "good reasons in our notice of determination or decision for the weight ... give[n] your treating source's opinion." 20 C.F.R. § 404.1527(d)(2); see also SSR 96- 5p.

The Sixth Circuit has noted that the ALJ must provide good reasons for the weight given a treating source's opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). The *Wilson* Court reversed and remanded a denial of benefits, even though "substantial evidence otherwise supports the decision of the Commissioner," because the ALJ failed to give good reasons for discounting the opinion of the claimant's treating physician. *Wilson*, 378 F.3d at 543-46. As the *Wilson* court commented, "[a] court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Id.* at 546.

No error occurred as a result of the ALJ's failure to adopt Vakharia's conclusory opinion that Plaintiff was totally disabled. Such an opinion did not concern the nature or severity of Plaintiff's impairments. Rather, it was an opinion on an issue reserved to the Commissioner and was entitled to no "special significance." 20 C.F.R. § 404.1527(e)(1), (3); *see also Wilson*, at 547 (noting in dicta that certain de minimis violations of the § 1527(d)(2) procedural requirement might qualify as harmless error, including if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it").

In his written opinion, the ALJ failed to specifically discuss Dr. Vakharia's August 2004 findings regarding Plaintiff's specific extertional, postural, and non-exertional limitations. Defendant acknowledges that Dr. Vakharia is a treating physician and concedes that there is evidence in the record to support Dr. Vakharia's opinion. Defendant asserts, however, that no error occurred because the ALJ's rejection of Dr. Vakharia's opinion was supported by the objective medical evidence.[6] There is certainly ample evidence in the record to support the ALJ's ultimate determination. However, the Court, constrained by *Wilson*, may not make such a determination in the first instance as it is not this Court's function to remedy the ALJ's error by independently searching the record to find substantial evidence to support his ultimate decision. *Wilson*, 378 F.3d at 546; *see also Smith v. Heckler*, 760 F.2d 184, 187 (8th Cir. 1985); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Therefore, the case must be remanded so that the ALJ may conduct a proper analysis of Dr. Vakharia's August 2004 opinion, specifically citing to the medical findings that support his determination.[7]

_____

[6]     Defendant cites to various examination findings that would support the ALJ's rejection of Dr. Vakharia's opinion such as negative straight leg raising tests, etc. However, the ALJ's written opinion is devoid of any reference to such findings.

[7]     Plaintiff asserts the ALJ misrepresented his doctors' statements regarding the need for lower back surgery. (Pl.'s Mot. for Summ.J. at 18). Although the ALJ did not recite the entirety of the statements to which Plaintiff alludes, the Courts sees no error. Read as a whole, the ALJ's opinion states that Dr. Malik felt Plaintiff's lower back surgery was not warranted in January 2002. When the idea of surgery was later re-visited, Plaintiff was considering it and Dr. Pasupuleti told Plaintiff that the surgery was not an emergency and that it was a decision reserved for the Plaintiff. (Tr. 17, 18). The Court notes, however, that Dr. Malik stated that he did not believe any further conservative treatment options remained available to treat Plaintiff's back pain. (Tr. 244). The ALJ did not comment upon what inferences he made from the statements made by Drs. Malik and Pasupuleti and, as previously, noted, he made no determination as to whether Plaintiff's lack of financial resources, and care support, affected Plaintiff's ability to have the surgery.

b.      **Plaintiff's Credibility**

The ALJ stated that he considered Plaintiff's complaints of pain, limitations, and restrictions but determined that the extent and frequency reported was not fully credible or supported by the objective, medical evidence.  (Tr. 19).  Plaintiff claims that the ALJ erred in reaching this conclusion.

As with his rejection of Dr. Vakharia's report, the ALJ provided no reasoned explanation for the basis of his determination that Plaintiff's subjective allegations of disabling pain and limitations were not supported by the record.  SSR 96-7p, 1996 WL 374186, states the following regarding an ALJ's duty to articulate the basis for a credibility determination:

> It is not sufficient for the adjudicator to make a singly, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

The ALJ failed to comport with the requirements of SSR 96-7p in assessing Plaintiff's credibility.[8]  As noted previously, the ALJ failed to discuss any of the examination findings and how they affected his analysis of Plaintiff's claims.  He noted Plaintiff's medications and other treatment but provided no explanation as to how he weighed these facts.  Furthermore, the ALJ's

---

[8]      The ALJ did specifically find Plaintiff's claim that he needs to takes naps to be unsupported by the record in that no treating or examining physician had recommend as much. This finding should be re-examined, if necessary, in light of Dr. Vakharia's opinion.  The ALJ also discussed Plaintiff's claimed memory deficiencies associated with his medication although he did not discuss the effect of this medication on Plaintiff's reported need to nap.  This, too, should be addressed upon remand.

recitation of Plaintiff's daily activities suggests that he found them to be diminished.[9]  (Tr. 19).

Accordingly, the ALJ's failure to articulate the basis for his credibility determination cannot be

deemed harmless error. On remand, the ALJ must re-assess the credibility of Plaintiff's

allegations by providing a reasoned explanation as to the basis for his credibility assessment.  If

necessary, the ALJ must also undertake a new step-five analysis after fully considering the

impact, if any, of Dr. Vakharia's opinion and Plaintiff's credible statements on his RFC finding.

## VI.   RECOMMENDATION

The Commissioner's decision is not supported by substantial evidence.  Defendant's

Motion for Summary Judgment (Docket # 8) should be **DENIED**.  Plaintiff's Motion for

Summary Judgment (Docket # 7) should be **DENIED** and the case **REMANDED** for further

proceedings consistent with this Report**.**

Either party to this action may object to and seek review of this Report and

---

[9]        The only clear reason that the ALJ provided for finding Plaintiff less than fully credible was lack of motivation, citing to the money Plaintiff received from workers' compensation.  (Tr. 19).  While not improper, it does not, standing alone, provide substantial evidence to support his credibility determination.  *Compare Mullen v. Bowen*, 800 F.2d 535, 547 (6th Cir. 1986)(claimant's receipt of benefits from workers' compensation and retirement properly considered by ALJ in making credibility determination; *Shriver v. Chater*, 1995 WL 454710 * 3 (10th Cir. 1995)(unpublished)(given Congress' intent that workers receive both workers' compensation and social security disability, the receipt of workers' compensation benefits should have no bearing on credibility); *Weed v. Sec'y of Health & Human Srvs.,* 1994 WL 162617 * 3 (6th Cir. 1994)(unpublished)(receipt of workers' compensation benefits did not support ALJ's credibility determination where record showed claimant had good work record, attempted to return to work, was advised by his doctors not to return to work, and his doctors felt he was not malingering).

Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 11, 2007            s/ Mona K. Majzoub
                                   **MONA K. MAJZOUB**
                                   **UNITED STATES MAGISTRATE JUDGE**

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date

Dated: January 11, 2007            s/ Lisa C. Bartlett

                                   Courtroom Deputy

-24-